2023 IL App (3d) 210460

Opinion filed August 21, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-21-0460 |
| v. | ) ) | Circuit No. 18-CF-787 |
| QUADRIX T. BROWN, | ) ) ) | Honorable Alicia Washington, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.
Justice Albrecht concurred in the judgment and opinion.
Justice Peterson concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1        Defendant, Quadrix T. Brown, appeals from his Class 2 felony conviction of driving while

license revoked (DWLR) (625 ILCS 5/6-303(a), (d-5) (West 2018)), for which he received an

eight-year prison sentence. Defendant contends the trial court should have declared a mistrial upon

erroneously and belatedly barring his necessity defense (1) based on flawed *obiter dictum* and

(2) after defendant had testified to driving illegally in reliance on a pretrial ruling permitting

defendant to present evidence supporting a necessity defense. Defendant further contends he was

prejudiced by the prosecutor's improper definition of reasonable doubt during closing argument.

Finally, defendant contends his felony conviction lacked evidentiary basis and must be reduced to a misdemeanor and his sentence modified accordingly. For the reasons that follow, we affirm defendant's conviction without enhancement, vacate his sentence, and remand with directions.

¶ 2                                    I. BACKGROUND

¶ 3        Defendant was charged with one count of Class 2 felony DWLR (*id.*)[1] for driving on August 15, 2018, while his "driver's license was revoked under section 11-501.1 or for a violation of section 11-501(a) of the Illinois Vehicle Code" (Code) (*id.* §§ 11-501(a), 11-501.1) and while having at least 15 prior convictions under section 6-303(a) of the Code. A jury trial was scheduled for June 2021.

¶ 4                                   A. Motion *in Limine*

¶ 5        Days before trial, the State moved *in limine* to bar defendant from raising the affirmative defense of necessity. The motion argued DWLR was an absolute liability offense to which no affirmative defense may apply.

¶ 6        On the morning of trial, the court held a hearing on the State's motion. It asked defense counsel to proffer facts regarding defendant's case that might warrant the defense of necessity. Defense counsel stated,

> "I can proffer that my client was driving on a suspended license, and that the only reason he got behind the wheel of the car is because he had a chance meeting with *** an ex-girlfriend. She had a knife, and she threatened him that she was going to do something to [his] girlfriend and him."

---

[1]Defendant's indictment cited only section 6-303(a), which sets forth the elements of a basic DWLR offense—a Class A misdemeanor. It did not cite section 6-303(d-5), which sets forth the enhancement factors for a Class 2 felony DWLR offense.

2

The court denied the State's motion, stating, in part,

> "[At] this time, with the information that the Court's been presented, the Court is going to deny the motion *in limine* and consider granting that particular instruction at the appropriate time.
>
> \* \* \*
>
> \*\*\* [I]n this particular matter, the Court is certainly willing to allow information to come in and then make a determination at the instruction time in regards to if that instruction will be rendered."

¶ 7                                    B. Jury Trial

¶ 8        Before admitting prospective jurors to the courtroom, the court read defendant's indictment and noted that the DWLR offense becomes a Class 2 felony "after so many violations." The court asked defense counsel, "Any issues \*\*\*? Concerns? Questions?" In response, defense counsel simply requested the jury be informed that defendant was asserting the defense of necessity.

¶ 9                              1. *Court's Opening Remarks*

¶ 10       During jury selection, the court informed the jury venire that defendant had pled not guilty to DWLR and was asserting the defense of necessity. It also stated that the jury must decide whether the State proved defendant guilty beyond a reasonable doubt and that the jury would not be told the meaning or definition of "beyond a reasonable doubt."

¶ 11                              2. *Opening Statements*

¶ 12       Both sides addressed the necessity defense in their opening statements. The State advised the jury that it will hear that defendant was driving on a revoked license "[a]nd he's going to want to use the defense of necessity, but that is absolutely not true. You're going to see video that [defendant] was not in fear of his life." Defense counsel, on the other hand, advised the jury that

defendant drove illegally but was asserting the defense of necessity. He stated, "[O]nly out of necessity did [defendant] drive to protect himself and his new girlfriend from the threats of his old girlfriend, who also had a knife earlier on and displayed it."

¶ 13                            3. *The State's Case-in-Chief*

¶ 14        The State's sole witness, Peoria police officer Mark Lamb, testified as follows. At around midnight on August 15, 2018, Lamb was patrolling the 1800 block of Lehman Avenue when he observed two vehicles coming around a corner at a fairly high speed, squealing their tires. A maroon Buick was apparently chasing a white Cadillac. The vehicles passed Lamb's squad car and pulled into a nearby parking lot. Lamb turned his squad car around and followed the vehicles into the parking lot. When he pulled up behind the vehicles, Lamb found them parked side by side. Although Lamb did not witness defendant driving or exiting the Cadillac, he observed defendant walk around the front of the Cadillac toward the Buick and begin to argue with Brianna Turner, the Buick's driver. Upon speaking with defendant, Lamb learned that Turner was defendant's girlfriend and that defendant "was just trying to get away from her." According to defendant, Turner "was mad at [defendant] and was chasing him because he had another female in his car." Defendant informed Lamb that "he was revoked." Upon running a name search, Lamb discovered that both defendant and Turner had revoked driver's licenses. He issued defendant citations for DWLR and for driving without proof of insurance. Lamb testified he did not recall if there was another person in the Cadillac, did not recall hearing any screaming or yelling, and did not notice a dangerous situation or that defendant was in fear or in any form of emergency.

¶ 15        The State presented two exhibits, both of which were admitted without objection: (1) defendant's driving abstract providing simply, "Revocation was in effect on 08-15-2018," and (2) a disc containing 43 minutes of Lamb's dashcam video footage of the encounter. Upon the

4

State's request, the court ruled that the second exhibit "should be published and admitted." Both exhibits are included in the record on appeal.

¶ 16    The State played the first minute of the video, which Lamb testified was an accurate depiction of the speeding vehicles, a sedan followed by an SUV, and of what unfolded when he pulled up to the vehicles parked in the apartment complex parking lot. The second half of the one-minute segment depicts a white sedan parked to the left of a maroon SUV. Lamb's police car pulls up just as defendant walks around the front of the sedan toward the SUV. The rear door on the sedan's driver's side is ajar. As Lamb approaches defendant, an unidentified passenger can be seen leveraging his body weight to shut the door.[2] Lamb asks, "What is going on?" Defendant responds, "Nothing man." In the last five seconds of the segment, defendant can be heard saying, "I'm in the car with another girl *** It's nothing," to which Lamb responds, "You damn near hit me!"

¶ 17    The State then played the video from 5 minutes and 56 seconds to 6 minutes and 2 seconds. In this short segment, Lamb asks defendant, "Are you suspended, revoked, or what?" Defendant responds, "Revoked." Due to court-related technical issues, however, the jury was unable to hear the soundtrack accompanying this segment. In the silent video, Lamb can be seen facing defendant and presumably speaking to him for the duration of the brief segment. After an attempt to fix the court's audio issue, the State opted to proceed without playing the audio for the jury.

¶ 18                          4. *Defendant's Case-in-Chief*

¶ 19    Upon defense counsel's request, the court played the first 5 minutes and 50 seconds of Lamb's dashcam video. The first minute overlapped the one-minute segment played in the State's case-in-chief. At the one-minute mark, after Lamb exclaims, "You damn near hit me!" defendant

_____

[2]It is clear the rear passenger door, not the driver's door, is momentarily ajar before being shut by the rear-seat passenger. An easy reference point is the side mirror on the driver's door; it does not move when the door is shut.

can be heard saying, "Right, because, you know, she's chasing me." Lamb then asks for identification and defendant provides his name, informing Lamb that his identification is in the car. Defendant walks back to the driver's side of the sedan, opens the driver's door, and appears to retrieve something from the driver's seat area. Lamb walks to the driver's side of the sedan, where defendant informs him that he has no identification and no license. When defendant tries to explain that "all it is, bro, I'm in the car with another girl," Lamb states, "I get that. That's fine. You're both driving like idiots—all right. You damn near hit me." After a short pause, defendant responds, "I understand that."

¶ 20　　　　Lamb takes down defendant's information and proceeds to speak to Turner, who insists she was not driving her vehicle. Due to hearsay concerns, the court muted the sound in the portion of this segment depicting Lamb's exchange with Turner. (Although Turner was on the State's witness list, she failed to appear.) Lamb speaks to Turner in defendant's presence for much of the video segment. In the final minute of the segment, Lamb speaks to Turner away from defendant.

¶ 21　　　　After the video segment is played for the jury, defendant testified as follows. At around midnight on August 15, 2018, he was leaving an apartment complex with Cierra Tracy, his girlfriend at the time. Tracy was driving because defendant did not have a driver's license. As they left the complex, "some lights jump[ed] behind" them, causing Tracy to pull over on Lehman Road. Defendant's ex-girlfriend, Turner, who had been following them too closely, pulled up beside their vehicle and "pinned [them] in." Turner began yelling at defendant and Tracy, "talking about what she was gonna do, all that." Without much thought, defendant told Tracy to switch seats and let him drive instead. He wanted to avoid the "drama" and thought he could extricate Tracy and himself from the situation with his superior driving skills. Defendant "didn't feel like [he] was in danger *** to where [he] had to call the police right then and there. [He] was just trying

6

to get up out of there." Defendant and Tracy switched seats, and defendant began to drive. As he came around the bend on Lehman Road, defendant noticed Lamb's police car and proceeded to turn into the nearest parking lot. Defendant thought Turner would end her pursuit if he entered a parking lot in the police car's vicinity. She did not end her pursuit. Instead, she followed his vehicle into the parking lot and parked beside him. Defendant exited his vehicle, leaving Tracy in the front passenger seat, and confronted Turner. He asked her why she was "running up on the car like that and trying to pin [them] in. And she kept saying, 'I'm gonna kill both of y'all,' woo, woo."[3] Lamb approached and asked defendant for his license. Defendant acknowledged that he did not have one. Lamb instructed him to stand behind his car and proceeded to speak to Turner. Lamb returned only to ask for defendant's name, which defendant provided. Lamb ran defendant's name, wrote him a ticket, and informed him that his car would be towed.

¶ 22 The defense did not call any other witnesses, and the trial was adjourned to the following morning for closing arguments.

¶ 23                                  5. *The State's Motion to Reconsider*

¶ 24 After the jury left for the day, the court informed the parties that, before defendant took the stand, the State provided the court a motion to reconsider its ruling denying the State's motion *in limine*. (Upon learning that defense counsel had not received a copy of the motion, the court instructed the State to provide defense counsel a copy, which it did soon after.) The motion urged the court to "bar the defense of necessity as it is not allowed by law." In support of this proposition, the motion argued that *People v. Jackson*, 2013 IL 113986, held that "for violations of [section] 6-303, when a defendant does not contest that his license was suspended or revoked, the offense is

---

[3]At this point in the examination, the court overruled the State's hearsay objections to defendant's testimony of his statements to Turner and of her response.

an 'absolute liability offense, and that there is no affirmative defense, such as insanity or necessity.' " The motion also argued that defendant did not satisfy the elements of the necessity defense as set forth in *People v. Janik*, 127 Ill. 2d 390 (1989), because he was "to blame for getting behind the wheel of his car [and] therefore he, himself, developed the situation for driving his vehicle while revoked."

¶ 25    The court granted the motion to reconsider the next morning, stating:

> "The Court has heard several arguments in regards to this very issue. The issue of necessity has been brought up over and over again in this particular set of facts. The Court has had the opportunity also to listen to statements made throughout the course of trial, in addition to reviewing case law that's been provided.
>
> The motion to reconsider involves necessity which in the criminal code has been discussed as an affirmative defense.
>
> Certainly it's defined as conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation to reasonably believe such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct.
>
> However, the defense of necessity is viewed as choosing. I recognize that everyone here has recognized those particular comments that have been made.
>
> The case of—the *Jackson* case that has been—*People v. Jackson*, the supreme court case that has been cited talks a little bit more about the Illinois Vehicle Code.

8

And in the Illinois Vehicle Code, the issue of driving with a license suspended, driving with license revoked have been labeled as strict liability offenses, and the issue of affirmative defenses will not be given.

Based upon this information, the Court is looking at the Illinois Vehicle Code specifically, in addition to the additional cases that have been cited in the motion to reconsider, and the Court will grant the motion to reconsider at this time."

¶ 26                            6. *Jury Instruction Conference*

¶ 27    Minutes later, and consistent with its grant of the motion to reconsider, the court rejected defendant's proposed jury instructions referencing the necessity defense.

¶ 28                            7. *Closing Arguments*

¶ 29    In their closing arguments, both sides alluded to defendant's justification for driving on a revoked license (or lack thereof). The prosecutor stated, "Now what does reasonable doubt mean? It means the State has to prove that there was [*sic*] no other reasonable alternatives for the actions that the defendant took on August 15th, 2018." Defendant did not object to this statement. During the defense's closing argument, counsel stated, "[I]t was justifiable that [defendant] got behind the [wheel] of the car and drove it a short distance he did to get away from [Turner.]"

¶ 30    Before sending the jurors to deliberate, the court instructed them that the burden was on the State to prove defendant guilty beyond a reasonable doubt.

¶ 31                        8. *Jury's Clarification Request and Verdict*

¶ 32    During its deliberation, the jury submitted the following question to the court: "Clarification of the law for being able to drive like for a medical reason or something else or any other circumstances without a license or suspension." The court responded, "You have received the law. You have received your instructions. Please review[.]"

9

¶ 33    The jury returned a guilty verdict.

¶ 34                    C. Defendant's Posttrial Motion

¶ 35    Defendant moved for a new trial or, alternatively, an acquittal. He argued, in part, that the court erred in reversing itself and barring the necessity defense. According to defendant, the jury should have been instructed on the necessity defense.

¶ 36    The court denied the motion, stating it "stands by [its previous rulings], specifically referring to case law that was presented, *People v. Jackson*, as well as all of the information contained within the necessity information, specifically absolute liability offenses. So the Court does pay close attention to that information."

¶ 37                            D. Sentencing

¶ 38    At sentencing, the State noted that defendant's presentence investigation report (PSI) indicated he had 44 prior convictions for driving while license revoked or suspended, including the conviction in this case. The court sentenced defendant to an eight-year prison term.

¶ 39    Defendant moved to reconsider his sentence. At the hearing on the motion, defense counsel conceded that defendant had over 15 prior convictions for driving while license revoked or suspended. He argued, however, that an eight-year sentence was excessive in light of the circumstances that led defendant to drive the car.

¶ 40    The court denied defendant's motion, stating, "This Court has considered all items, but at the same time, I think it's important to note, [defense counsel], you can have an opinion. I didn't see the necessity defense in this particular situation, and this particular sentence stands at this time."

¶ 41    This appeal followed.

¶ 42                                    II. ANALYSIS

¶ 43        On appeal, defendant argues (1) the trial court erroneously barred his necessity defense because, contrary to the court's ruling, necessity was a viable defense to DWLR and defendant presented slight evidence to support the defense; (2) the trial court should have declared a mistrial upon barring his necessity defense after he admitted to committing DWLR in reliance on the court's initial ruling allowing him to pursue a necessity defense and, alternatively, defense counsel was ineffective for failing to move for a mistrial based on the court's decision to "reverse its ruling"; (3) he was deprived of his right to a fair trial when the prosecutor provided a "nonsensical" definition of reasonable doubt to the jury in closing argument; and (4) his Class 2 felony conviction must be reduced to a Class A misdemeanor, his sentence vacated, and the matter remanded for resentencing because the State failed to introduce any evidence that his license was revoked due to a driving-under-the-influence (DUI) violation under section 11-501(a) of the Code (625 ILCS 5/11-501(a) (West 2018)) when he committed the charged offense. We address defendant's arguments in turn.

¶ 44                            A. Viability of Necessity Defense

¶ 45        Defendant's first contention—that the court erroneously barred his necessity defense—is premised on the inapplicability of *Jackson*'s pronouncement barring the affirmative defense of necessity to absolute liability offenses under section 6-303 of the Code (*id.* § 6-303). The *Jackson* court stated, in pertinent part:

> "It is important to note, however, in light of the fact that both parties agree that section 6-303 has been construed to set forth an absolute liability offense, that there is no affirmative defense, such as insanity or necessity, to violations of that section where the defendant *does not contest* that his license was suspended or revoked."

11

(Emphasis in original.) *Jackson*, 2013 IL 113986, ¶ 23 (citing *People v. Avery*, 277 Ill. App. 3d 824, 827, 830 (1995)).

Defendant maintains that this pronouncement is nonbinding *obiter dictum* based on distinguishable facts and inapposite case law. He further maintains that the pronouncement is an erroneous statement of law and argues there is no conflict between absolute liability, which obviates the need to prove *mens rea*, and the necessity defense, which does not contest *mens rea*. Defendant points to cases in which this court has recognized the right to raise affirmative defenses to a charge of driving with a suspended or revoked license. See *People v. Planer*, 161 Ill. App. 3d 938, 941-42 (1987); *People v. Dalton*, 7 Ill. App. 3d 442, 444-45 (1972); *People v. Espenscheid*, 109 Ill. App. 2d 107, 114 (1969). He also highlights cases in which our district has recognized that a defendant may raise the necessity defense to absolute liability offenses. See *People v. Kucavik*, 367 Ill. App. 3d 176, 181 (3d Dist. 2006); *People v. Gullens*, 2017 IL App (3d) 160668, ¶ 20. Defendant further argues that the supreme court's own case law contradicts *Jackson*'s pronouncement. See *People v. Kite*, 153 Ill. 2d 40, 44 (1992) (inmate may raise affirmative defense of necessity to absolute liability offense of weapon possession). Finally, defendant invokes public policy, arguing that noncompliance with section 6-303 may be justified in certain circumstances.

¶ 46       For the sake of argument, and without opining on the precedential value of *Jackson*'s pronouncement, we accept defendant's premise as true. For the forthcoming analysis, we assume necessity is a viable affirmative defense to a DWLR charge.

¶ 47                              B. Mistrial Contention

¶ 48       Defendant contends the trial court violated his right to a fair trial by failing to declare a mistrial *sua sponte* upon barring his necessity defense on the State's motion to reconsider. This contention is at the heart of defendant's appeal. According to defendant, he suffered substantial

12

prejudice because the court "reversed course" and barred his necessity defense after he had already taken the stand and admitted to driving on a revoked license. "A mistrial should be granted where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice." *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). Defendant argues that had he known before trial he would not be able to pursue a necessity defense, "he could have adopted a different trial defense which did not involve him testifying and admitting he committed DWLR."

¶ 49    Defendant's contention concerns his constitutional right to a fair trial. "In general, the standard of review for determining if an individual's constitutional rights have been violated is *de novo*." *People v. Hale*, 2013 IL 113140, ¶ 15. Defendant argues the trial court's grant of the State's motion to reconsider left him in an "untenable and prejudicial situation." See *People v. Cooper*, 66 Ill. App. 3d 205, 207 (1978). We reject defendant's contention.

¶ 50    1. *Trial Ruling's Evidentiary Basis*

¶ 51    Defendant argues the trial court reversed course by granting the State's motion to reconsider. This mischaracterizes the record. In finding the necessity defense unavailable to defendant, the trial court clearly considered whether the trial evidence lent any support to the necessity defense and determined that it did not. The court based its grant of the State's motion to reconsider on the two cases cited in the motion: (1) *Jackson*, 2013 IL 113986, and (2) *Janik*, 127 Ill. 2d 390. The motion cited *Janik* for the necessity defense elements and argued that defendant did not meet those elements because he was to blame for "getting behind the wheel of his car [and] therefore he, himself, developed the situation for driving his vehicle while revoked." In its ruling on the motion, the court indicated it had considered the evidence along with the case law provided in the motion. "Based upon this information," it stated, "the Court is looking at the Illinois Vehicle

13

Code specifically, *in addition to the additional cases* that have been cited in the motion to reconsider, and the Court will grant the motion to reconsider at this time." (Emphasis added.) Notably, the "additional cases" could only refer to the two cases cited in the motion to reconsider: *Jackson* and *Janik*.

¶ 52    Indeed, the court paid homage to *Janik* in its ruling by restating the elements of the necessity defense and observing, "[T]he defense of necessity is viewed as choosing." See *Janik*, 127 Ill. 2d at 399 ("This defense is viewed as involving the choice between two admitted evils where other optional courses of action are unavailable ***."). The court's ruling indicates it considered the evidence to determine whether defendant's conduct satisfied the elements of a necessity defense and whether it involved "choosing." The court prefaced its ruling by stating that it "had the opportunity also to listen to statements made throughout the course of trial." The court would not make such a statement only to disregard the trial testimony in its ruling. See *People v. Mullins*, 242 Ill. 2d 1, 18 (2011) (although trial court did not explicitly state it applied balancing test to determine admissibility of impeachment evidence, trial transcript established court's awareness and application of test).

¶ 53    The court's posttrial rulings confirm its partially fact-driven decision to withhold the proposed necessity instructions. Upon denying defendant's motion for a new trial, the court stated its decision to bar the necessity instructions was based on "*People v. Jackson*, as well as all of the information contained within the necessity information." Clearly, then, the court's ruling did not stop at *Jackson*'s pronouncement; rather, it accounted for all of the evidence presented at trial. In a subsequent ruling upholding defendant's sentence, the court stated, "I didn't see the necessity defense in this particular situation." Accordingly, beyond its reliance on *Jackson*, the court barred

14

defendant's proposed necessity instructions based on what it found was a lack of substantiating evidence.

¶ 54    Because the court ultimately considered the necessity defense under the facts of the case, its decision to preclude the necessity defense on the State's motion to reconsider did not deny defendant "fundamental fairness such that continuation of the proceedings would defeat the ends of justice." *Nelson*, 235 Ill. 2d at 435. The ruling's partial reliance on *Jackson*, even if improper, did not undermine its independent factual basis and did not deprive defendant of a fair trial. See *People v. Gawlak*, 2019 IL 123182, ¶ 39 (reviewing court may affirm on any basis in the record). Stated differently, the court's exclusion of the necessity instructions was inevitable, with or without *Jackson*'s pronouncement. A mistrial was therefore not warranted. The issue thus resolved, we see no reason to address defendant's alternative argument that his counsel was ineffective for failing to move for a mistrial. See *People v. Stewart*, 365 Ill. App. 3d 744, 750 (2006) (attorney is not ineffective for failing to pursue an unwarranted motion).

¶ 55                    a. Exclusion of Necessity-Defense Instructions

¶ 56    Our analysis would not be complete without reviewing the factual basis for the court's exclusion of the necessity instructions. "A defendant is entitled to instructions on his theory of the case when there is some foundation in the evidence for the instructions." *People v. Wicks*, 355 Ill. App. 3d 760, 763 (2005). "Only a slight amount of evidence is required to justify giving an instruction." *Id.* Conversely, the court may only withhold a necessity instruction when the evidence is "so clear and convincing as to permit the court to find as a matter of law that there is no affirmative defense." *Kucavik*, 367 Ill. App. 3d at 181. "A trial court's decision with regard to

15

issuing specific jury instructions is reviewed under an abuse of discretion standard." *Wicks*, 355 Ill. App. 3d at 763.

¶ 57 The necessity defense hinges on two elements: (1) defendant's blameless role in occasioning the situation and (2) defendant's reasonable belief that his otherwise illegal conduct was necessary to avoid a greater injury. *Janik*, 127 Ill. 2d at 399. "This defense is viewed as involving the choice between two admitted evils where other optional courses of action are unavailable [citations], and the conduct chosen must promote some higher value than the value of literal compliance with the law [citation]." *Id.* Further, a defendant seeking to raise the necessity defense "must show that he faced a specific and immediate threat." (Internal quotation marks omitted.) *Gullens*, 2017 IL App (3d) 160668, ¶ 25.

¶ 58 Accepting defendant's testimony as true, the trial lacked even slight evidence supporting a necessity defense. First, defendant could not be deemed blameless when he occasioned the illegal driving situation by instructing Tracy to switch seats so he could drive. This was not a situation, for example, where the driver fell unconscious and defendant had no reasonable option but to drive. Second, defendant did not drive to avoid a greater injury but, rather, to escape the "drama" arising from an uncomfortable love-triangle confrontation. Defendant's desire to escape drama, without more, is an insufficient basis for a necessity defense.

¶ 59 Further, the evidence does not indicate defendant made a choice between two evils where other optional courses of action were unavailable, nor does it indicate the promotion of a value higher than literal compliance with the law. See *Janik*, 127 Ill. 2d at 399. Defendant himself acknowledged that he "just wasn't thinking" when he instructed Tracy to switch seats. His testimony paints a picture of rash decision-making, not of necessity or the promotion of some higher value. The video footage, moreover, demonstrates defendant did not consider Turner a

16

serious and immediate threat. See *Gullens*, 2017 IL App (3d) 160668, ¶ 25. Defendant never once indicated to police, by words or actions, that he felt threatened by Turner. At one point in the video, defendant is seen calmly handing Turner his phone. "If a defendant chooses to give an explanation for his incriminating situation, he should provide a reasonable story or be judged by its improbabilities." *People v. Hart*, 214 Ill. 2d 490, 520 (2005). Quite simply, under no reading of the facts would necessity be a viable defense.

¶ 60    When the court denied the State's motion *in limine*, it did so expecting defendant to provide evidence of the seriousness and immediacy of Turner's threats against defendant and Tracy. Based on defense counsel's pretrial proffer, the court reasonably anticipated testimony of Turner's threatening knife display. By the close of evidence, however, no knife-related evidence had been adduced, and no testimony had been introduced to suggest defendant faced a specific and immediate threat such that his only reasonable alternative was to drive on a revoked license. Because defendant's own testimony failed to substantiate his pretrial evidence proffer, the trial court properly denied the necessity instructions. The evidence before the court was so clear and convincing as to permit the court to find, as a matter of law, that no necessity defense applied. See *Kucavik*, 367 Ill. App. 3d at 181. Accordingly, its decision to withhold the proposed necessity instructions was not an abuse of discretion.

¶ 61    2. *Defendant's Case Law Argument*

¶ 62    Although the foregoing analysis conclusively resolves defendant's mistrial contention, defendant argues that established precedent compels a different conclusion. He directs our attention to (1) *Cooper*, 66 Ill. App. 3d 205, which he contends is analogous to this case, and (2) *People v. Patrick*, 233 Ill. 2d 62 (2009), which he maintains is "highly instructive."

17

¶ 63                              a. *People v. Cooper*

¶ 64        In *Cooper*, the defendant took the stand after the court issued a "definitive ruling" barring defendant's impeachment by prior conviction evidence. *Cooper*, 66 Ill. App. 3d at 205-206. Following the defendant's testimony, the court allowed the State to impeach the defendant by a prior conviction. *Id.* at 206. The jury returned a guilty verdict. *Id.* The appellate court reversed and remanded for a new trial. *Id.* at 208. It held that "[t]he untimely revocation of the [court's initial] ruling was fundamentally unfair to the defendant and placed him in an untenable and prejudicial position." *Id.* at 207. The court explained that the initial ruling "afforded the defendant *definitive advance knowledge* that he would not be subjected to impeachment." (Emphasis added.) *Id.*

¶ 65        This case is distinguishable from *Cooper*. First, unlike in *Cooper*, the court's trial ruling foreclosing the necessity defense was not an "untimely revocation" of the court's pretrial ruling. See *supra* ¶ 51. At no point in the proceedings did the court provide defendant "definitive advance knowledge" that it would deliver his proposed necessity-defense instructions to the jury. Quite the contrary, the court "afford[ed] defendant actual notice that the matter would be reopened" at instruction time. See *Cooper*, 66 Ill. App. 3d at 207. Upon denying the State's motion *in limine*, the court advised the parties that it was "certainly willing to allow information to come in and then make a determination at the instruction time." Thus, by later barring the necessity instructions, the court was simply making its "determination at the instruction time."

¶ 66        The distinctions go deeper, however, extending to defendant's instigation of the very events he now laments. In stark contrast to *Cooper*, defendant induced the court, by his proffer of a knife threat, to provisionally allow his necessity defense. "[At] this time," the court stated in its pretrial ruling, "with the information that the Court's been presented, the Court is going to deny the motion *in limine* and consider granting that particular instruction at the appropriate time."

18

Defendant subsequently failed to testify about a knife threat, effectively creating an untenable and prejudicial situation for himself. Any claim of fundamental unfairness falters on this fact alone.

¶ 67 In short, defendant's reliance on *Cooper* is misplaced. The trial ruling barring his necessity defense was neither an untimely revocation nor fundamentally unfair. Defendant's proposed instructions were never guaranteed, his testimony fell woefully short of the requisite "slight evidence" standard, and he failed to substantiate the knife-threat proffer that induced the court to consider his necessity defense in the first instance.

¶ 68                                b. *People v. Patrick*

¶ 69 In the case defendant maintains is highly instructive, the defendant (Patrick) asserted self-defense to a charge of first degree murder. *Patrick*, 233 Ill. 2d at 66, 75. Seeking to testify at his jury trial, Patrick moved *in limine* to bar the State from impeaching him by prior conviction evidence. *Id.* at 66. The trial judge refused to consider the motion until Patrick testified, explaining this was his policy in all cases. *Id.* After Patrick testified, the court allowed the State to impeach Patrick by three prior convictions for possession of a controlled substance. *Id.* In its closing argument, the State repeatedly urged the jury not to believe a three-time convicted felon. *Id.* at 75-76. The jury found Patrick guilty of *second degree* murder, and the appellate court affirmed. *Id.* at 67.

¶ 70 The supreme court reversed and remanded for a new trial. *Id.* at 76. It conducted a two-step analysis to determine whether reversal was warranted. *Id.* at 74-76. First, it considered whether the trial judge abused his discretion by delaying his ruling on the admissibility of prior convictions until after the defendant had testified. *Id.* at 74-75. It quickly found the judge had abused his discretion, noting that his "blanket refusal in every criminal case *** was arbitrary and without reason." *Id.* Second, the court considered whether the judge's abuse of discretion—an

19

error of constitutional magnitude—was harmless beyond a reasonable doubt. *Id.* at 75. The abuse of discretion, it concluded, was not harmless where Patrick was substantially prejudiced by the State's "focused and repeated argument urging the jury not to believe a three-time convicted felon." *Id.* at 75-76. Observing that Patrick's credibility was pivotal to his self-defense theory, the court noted that the jury's second degree murder verdict indicated "that, to some degree, the jury believed Patrick was justified in his use of force." *Id.* at 76. It opined, "If Patrick had known before testifying that his prior convictions were going to be admitted, he may have decided not to testify, or at least he could have informed the jury earlier of the prior convictions to lessen the negative impact [on his credibility]." *Id.* at 75. Accordingly, the court found "Patrick was unjustifiably required to make a tactical decision without the ability to evaluate the impact it would have on his defense." *Id.*

¶ 71          This case is markedly distinct from *Patrick*. We have already determined that the trial court has not abused its discretion in barring defendant's necessity defense. Unlike the trial judge's blanket deferral policy in *Patrick*, the court's pretrial ruling here was not arbitrary or without reason. Moreover, to the extent the court's trial ruling erroneously relied on *Jackson*'s pronouncement, it was sufficiently buttressed by a valid basis—namely, the want of evidence supporting defendant's necessity defense. We are not bound by the trial court's reliance on *Jackson* and may affirm on any basis supported by the record. *Gawlak*, 2019 IL 123182, ¶ 39. The court neither abused its discretion in provisionally allowing the necessity defense, nor in ultimately barring the defense. Accordingly, we need not advance to the second step of *Patrick*'s analysis, which considers whether the court's abuse of discretion was harmless beyond a reasonable doubt.

20

¶ 72                                                      3. *No Structural Error*

¶ 73        In reaching our conclusion, we have reserved judgment on *Jackson*'s pronouncement and assumed, consistent with defendant's position, that necessity is a viable defense to DWLR. *Supra* ¶ 46. The dissent operates on the opposite assumption: that defendant's necessity defense was never viable under *Jackson*. *Infra* ¶ 109. Based on this foundation, the dissent argues the trial court erred in "giv[ing] defendant the ultimately false ruling and impression that necessity was available to him." *Infra* ¶ 110. This, according to the dissent, amounted to structural error requiring automatic reversal. We disagree.

¶ 74        A structural error impairs a trial's framework, resulting in a trial that is "fundamentally unfair or unreliable in determining guilt or innocence." *People v. Averett*, 237 Ill. 2d 1, 12-13 (2010). Unlike an error in the trial process, a structural error typically results in "necessarily unquantifiable and indeterminate" consequences. (Internal quotation marks omitted.) *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006). Accordingly, a structural error defies harmless-error review and requires automatic reversal. *Id.* at 148; *Averett*, 237 Ill. 2d at 12, 14. Only in a "very limited class of cases" has the United States Supreme Court deemed an error structural. (Internal quotation marks omitted.) *Averett*, 237 Ill. 2d at 13. Those cases have included "a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction." *Id.* In determining whether an error is structural, Illinois courts will often consider whether an error is comparable to these recognized structural errors. *People v. Moon*, 2022 IL 125959, ¶ 30. If the defendant alleging constitutional error was represented by counsel and tried by an impartial adjudicator, there is a "strong presumption" that harmless-error review applies. (Internal quotation marks omitted.) *Id.* ¶ 28.

¶ 75        In support of its structural-error conclusion, the dissent maintains the trial court committed error by improperly inducing defendant to waive his constitutional right against self-incrimination, thereby resulting in his admission of guilt on the witness stand. See U.S. Const., amend. V ("No person *** shall be compelled in any criminal case to be a witness against himself ***."); Ill. Const. 1970, art. I, § 10 ("No person shall be compelled in a criminal case to give evidence against himself ***."). We will accept this premise as true for the sake of argument.[4] Our supreme court has emphasized that self-incrimination is only unconstitutional when compelled:

> " '[T]here is no such thing as a constitutional privilege against self-incrimination. There is a privilege only against *compelled* self-incrimination. The key element is compulsion. The core purpose of the privilege is not to protect a defendant against self-incrimination generally nor even to guard a defendant against foolish and ill-advised self-incrimination; it is to shield a defendant against governmental coercion.' " (Emphasis in original.) *People v. Hall*, 195 Ill. 2d 1, 25 (2000) (quoting *Ross v. State*, 552 A.2d 1345, 1347 (Md. Ct. Spec. App. 1989)).

¶ 76        Defendant's waiver of his right to remain silent was not the result of compulsion or coercion. (In fact, defendant does not allege a violation of his right to silence.) Absent compulsion or coercion, we hesitate to extend the structural-error doctrine to the trial court's rulings. We further decline to view the court's rulings in a vacuum. Defendant induced the trial court's pretrial ruling and made a strategic decision to prevent the State from controlling the narrative at trial. Defendant's decision to admit fault, made in consultation with his attorney, was necessarily linked

---

[4]Although we accept this premise for argument's sake, we observe that it overstates the judge's role in our adversarial system. The trial court cannot be said to have caused defendant to rely on a (presumably) flawed legal position when (1) defendant, by his counsel, urged the court to adopt that position, and (2) neither party alerted the court to *Jackson*'s one-sentence pronouncement until the trial was well under way.

22

to the weight of the evidence against him. Unlike the structural errors recognized by the U.S. Supreme Court, each of which infect the trial's framework, the court's error in this case was confined to the presentation of evidence. This is not to say the error was insignificant; it merely demonstrates the error's amenability to harmless-error review.

¶ 77 This case is unlike *Moon*, in which our supreme court held that the failure to administer a jury oath in a criminal trial constitutes structural error. *Moon*, 2022 IL 125959, ¶ 60. The court explained that "swearing the jury is part of the very framework within which the trial proceeds." *Id.* ¶ 66. Here, in contrast, a misinformed decision to testify is a matter of trial strategy, strictly tied to the trial process. Defendant's decision to testify based on an erroneous ruling in his favor, not knowing whether he would "get away with it," is more akin to Patrick's decision to testify not knowing whether the court would allow the State to impeach him with prior conviction evidence. See *Patrick*, 233 Ill. 2d at 66. In both circumstances, the defendant's gamble did not alter the constitutional framework of the trial. See *Averett*, 237 Ill. 2d at 14 ("This court's application of harmless-error review in *Patrick* demonstrates that we did not treat the error as structural.").

¶ 78 Moreover, where the consequences of the court's error are quantifiable and determinate, the structural-error doctrine is inapplicable. See *Gonzalez-Lopez*, 548 U.S. at 150. In *Moon*, the court based its structural-error holding, in part, on " 'the difficulty of assessing the effect of the error.' " *Moon*, 2022 IL 125959, ¶ 66 (quoting *Gonzalez-Lopez*, 548 U.S. at 149 n.4). The court explained that the "effect of a complete failure to administer a jury oath is difficult, if not impossible, to measure because the error concerns the subjective frame of mind of the individual jurors." *Id.* Here, in contrast, measuring the effect of the trial court's error is a straightforward, objective analysis; it does not require a " 'speculative inquiry into what might have occurred in an alternate universe.' " *Id.* ¶ 65 (quoting *Gonzalez-Lopez*, 548 U.S. at 150 (discussing futility of

23

subjecting structural error to harmless-error analysis)). By barring defendant's necessity defense following his testimony, the trial court left his incriminating statements unmitigated by the defense he had hoped to present. A harmless-error analysis is perfectly suited for this situation. Indeed, where defendant has not alleged denial of representation or trial by a biased adjudicator, a "strong presumption" exists in favor of harmless-error review. See *id.* ¶ 28. Accordingly, granting the premise that the trial court erred by giving defendant the false ruling and impression that necessity was a viable defense, we fail to see structural error. We now assess whether the court's error, a non-structural error, was harmless beyond a reasonable doubt.

¶ 79                                    a. Harmless-Error Analysis

¶ 80        Where a constitutional error is at issue, the State bears the burden of proof to show beyond a reasonable doubt that the error did not affect the outcome of the proceeding. *Mullins*, 242 Ill. 2d at 23. "In other words, the inquiry is whether the defendant would have been convicted regardless of the error." (Internal quotation marks omitted.) *Id.* "In determining whether, in the absence of the error, the outcome of the trial would have been different, review is made of the proceedings as a whole, based upon examination of the entire record." *Id.*

¶ 81        Both elements of DWLR are clearly supported by the record, independent of defendant's testimony. First, evidence of defendant's revoked status was incontrovertible. Lamb's testimony that defendant acknowledged his revoked status was corroborated by defendant's driving abstract and defendant's audible admission in the dashcam footage.

¶ 82        Second, the record overwhelmingly identifies defendant as the Cadillac's driver. Although the video does not show defendant exiting the Cadillac, it shows him walking around the front of the Cadillac from the driver's side of the vehicle and later return to retrieve items from the driver's seat area. At no point in the dashcam video footage does defendant deny driving the Cadillac.

24

When Lamb rebukes defendant for nearly colliding with his police car, defendant acknowledges his conduct and explains he was being chased by Turner. Notably, the video shows Lamb peer into the Cadillac during the first minute of the encounter yet proceed to berate defendant for nearly colliding with his vehicle. Lamb's inspection of the Cadillac's interior apparently revealed no other potential driver. Despite the lack of direct evidence, Lamb's testimony and the dashcam footage overwhelmingly point to defendant as the Cadillac's driver. The jury had no reason to conclude otherwise. "A conviction can be sustained upon circumstantial evidence as well as upon direct, and to prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it." *People v. Williams*, 40 Ill. 2d 522, 526 (1968). In short, we have no doubt that the jury verdict would have been the same, irrespective of defendant's decision to testify.

¶ 83        As demonstrated here, harmless-error review does not require "speculative inquiry into what might have occurred in an alternate universe." *Gonzalez-Lopez*, 548 U.S. at 150. To the extent the trial court erred, its error was harmless beyond a reasonable doubt.

¶ 84                                        4. *Conclusion*

¶ 85        The pretrial ruling provisionally allowing the necessity defense and the trial ruling barring the defense conflicted only insofar as the trial ruling relied on *Jackson*. The rulings were otherwise consistent with each other. Because the trial ruling was sufficiently based in evidentiary considerations, it did not amount to an abuse of discretion.

¶ 86        Alternatively, assuming the necessity defense was never available to defendant, the court's error was not structural, and moreover, it was harmless beyond a reasonable doubt.

¶ 87        In so ruling, we acknowledge the highly irregular circumstances underlying this appeal. Defendant's trial was by no means perfect. "However, a defendant is entitled to a fair trial, not a

25

perfect one." *People v. Griffin*, 178 Ill. 2d 65, 90-91 (1997). Despite the irregularities, defendant was not deprived of fundamental fairness. See *Nelson*, 235 Ill. 2d at 435. A mistrial was therefore not warranted.

¶ 88                                  C. Improper Definition of Reasonable Doubt

¶ 89          Next, defendant argues that the prosecutor's "nonsensical" definition of reasonable doubt during closing argument constitutes reversible error. Whether a prosecutor's improper argument constitutes reversible error is a purely legal question that we review *de novo*. *People v. Sullivan*, 2014 IL App (3d) 120312, ¶ 26. Defendant forfeited this claim by failing to raise it in the trial court. *People v. Sebby*, 2017 IL 119445, ¶ 48. Still, we may consider a forfeited claim where the defendant demonstrates a plain error occurred. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). To prevail under the plain-error doctrine, a defendant must first show that a clear or obvious error occurred. *People v. Galarza*, 2023 IL 127678, ¶ 45. If an error has occurred, we will only reverse if (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Id.*

¶ 90          Here, the State committed a clear and obvious error when it attempted to define reasonable doubt for the jury. "[N]either the trial court nor counsel should define reasonable doubt for the jury." *People v. Downs*, 2015 IL 117934, ¶ 19; see *People v. Davis*, 406 Ill. 215, 220 (1950) ("[R]easonable doubt needs no definition and it is erroneous to give instructions resulting in an elaboration of it."). Here, despite the court advising prospective jurors they "will not be told the meaning or definition of 'beyond a reasonable doubt,' " the State advised the jury that reasonable doubt "means the State has to prove that there was [*sic*] no other reasonable alternatives for the actions that the defendant took on August 15th, 2018."

26

¶ 91    Defendant argues the State's improper definition of reasonable doubt constitutes second-prong plain error because it is so serious that it affected trial fairness. We disagree.

¶ 92    "[A] prosecutor's attempt to define reasonable doubt constitutes plain error only when it causes substantial prejudice to the defendant." *Sullivan*, 2014 IL App (3d) 120312, ¶ 30. Courts have found substantial prejudice when the reasonable-doubt definition (1) suggests the State has no burden of proof or attempts to shift that burden to the defendant, (2) reduces the State's burden of proof to a minor detail, or (3) constitutes an involved instruction on reasonable doubt. *People v. Howell*, 358 Ill. App. 3d 512, 524 (2005). "Reviewing courts will consider the closing argument as a whole, rather than focusing on selected phrases or remarks." *People v. Perry*, 224 Ill. 2d 312, 347 (2007).

¶ 93    The State's definition, though erroneous, did not substantially prejudice defendant. First, the definition did not suggest the State has no burden of proof or attempt to shift that burden to defendant. In fact, just before he offered the definition, the prosecutor acknowledged that "[t]he State has the burden of proof in this case." Second, the State did not reduce its burden to a minor detail. After offering the erroneous definition, the prosecutor underscored the State's burden of proof:

>           "Now the State has to prove beyond a reasonable doubt that the Defendant committed the offense of driving on a revoked license, had to prove three things[:] [t]hat the Defendant drove on a public highway in Peoria County—in Peoria County, and the third, that at the time he was driving, his license was revoked."

These follow-up remarks reoriented the jury to the correct burden of proof, without diminishing the State's burden. Finally, the improper definition was not an "involved instruction" such that it warranted reversal. See, *e.g.*, *People v. Viser*, 62 Ill. 2d 568, 585 (1975) (improper definition was

27

not "involved" and thus not reversible error where it described reasonable doubt as " 'substantial rather than speculative' " and defined it as " 'sufficient to cause a reasonably prudent person to hesitate to act in the more important affairs of his life' "). Accordingly, where defendant was not substantially prejudiced, the State's attempt to define reasonable doubt does not constitute plain error. *Sullivan*, 2014 IL App (3d) 120312, ¶ 30.

¶ 94    Ironically, the State's improper definition was to defendant's advantage; it legitimized defendant's necessity defense despite the court's decision to bar the defense. By indicating it needed to prove there were no reasonable alternatives for defendant's actions, the State essentially asked jurors to consider whether defendant's conduct was justified by necessity. See *Janik*, 127 Ill. 2d at 399 (necessity defense involves "choice between two admitted evils where other optional courses of action are unavailable"). The improper definition thus resulted in an extra burden on the State alongside its existing burden to prove the requisite elements of DWLR. See *supra* ¶ 93. Though improper, this added burden did not undermine trial fairness or challenge the integrity of the judicial process. Accordingly, defendant's claim does not survive forfeiture.

¶ 95                              D. Enhanced Sentence

¶ 96    Finally, defendant contends the trial court erred when it sentenced him to an eight-year prison term based on an enhanced Class 2 felony DWLR charge. In particular, defendant argues the State presented no evidence to demonstrate his underlying revocation was due to a DUI conviction or that 15 or more of his prior DWLR convictions occurred when his driver's license was suspended or revoked based on a violation of section 11-501(a) of the Code (625 ILCS 5/11-501(a) (West 2018)).

¶ 97    Although defendant did not preserve this issue for appeal, the right to be lawfully sentenced is a substantive right, affecting the "fundamental right to liberty." *People v. Smith*, 2016 IL App

28

(1st) 140496, ¶ 15. Accordingly, we may review this issue for second-prong plain error. See *Galarza*, 2023 IL 127678, ¶ 45 (second-prong error is one that affects trial fairness and challenges the integrity of the judicial process). In the sentencing context, "an error is reversible under the second prong where that error was so egregious as to deny the defendant a fair sentencing hearing." (Internal quotation marks omitted.) *People v. Mitok*, 2018 IL App (3d) 160743, ¶ 8.

¶ 98    The prosecution must prove defendant's eligibility for an enhanced sentence by a preponderance of the evidence. *People v. Robinson*, 167 Ill. 2d 53, 71-73 (1995). For any prosecution under section 6-303 of the Code, "a certified copy of the driving abstract of the defendant shall be admitted as proof of any prior conviction." 625 ILCS 5/6-303(f) (West 2018).

¶ 99    Under section 6-303(d-5), a person convicted of a fifteenth or subsequent DWLR offense is guilty of a Class 2 felony if (1) "the current violation occurred when the person's driver's license was suspended or revoked for a violation of Section 11-401 or 11-501 of this Code," and (2) "the prior convictions under this Section occurred while the person's driver's license was suspended or revoked for a violation of Section 11-401 or 11-501 of this Code." *Id.* § 6-303(d-5).

¶ 100    The record indicates the trial court simply assumed the charged offense was properly classified as a Class 2 felony due to "so many [prior] violations." Section 6-303(d-5) indicates, however, that such a classification is only proper if the prior violations are based on a suspension or revocation under section 11-401 or 11-501 of the Code. Based on defendant's indictment, only section 11-501 (mandating license revocation for DUI violations) applies here. The State submitted to the trial court a driving abstract indicating only that "[r]evocation was in effect on 08-15-2018," along with a PSI listing 43 prior convictions of driving while license revoked or suspended. Crucially, neither document indicates the basis for defendant's most recent license revocation. The record, moreover, does not reflect that the trial court found, by a preponderance of the evidence,

29

that defendant's relevant license revocation was based on a DUI conviction under section 11-501. Accordingly, defendant's Class 2 felony enhancement was improper.

¶ 101    The State acknowledges it failed to provide the trial court a factual basis for applying section 6-303(d-5)'s enhancement factors. It objects, however, to defendant's request that this court reduce defendant's conviction to a Class A misdemeanor, arguing there is a need for "further research into the bases for defendant's suspension(s) and revocation(s) and what convictions followed those events." The State therefore urges us to remand for a new sentencing hearing.

¶ 102    Defendant, on the other hand, argues we can resolve this classification issue by simply reviewing the PSI. According to defendant, the PSI indicates that the license revocation relevant to the instant offense is not based on a section 11-501 violation. The PSI, defendant argues, indicates he was convicted of a DUI offense only once—in a 2003 case. He was subsequently convicted of DWLR in 2003 and 2004, and later convicted of driving while license *suspended* in a 2005 case, and once again in a 2007 case. In essence, defendant argues we can infer, based on the suspension of his license following its revocation, that he obtained a new license at some point after his DUI conviction. He reasons, "Surely a revoked (nonexistent) license cannot be suspended."

¶ 103    A PSI "is generally a reliable source for the purpose of inquiring into a defendant's criminal history." *People v. Williams*, 149 Ill. 2d 467, 491 (1992). In this case, however, where defendant has failed to bring his argument to the attention of the trial court, we decline to draw any conclusions based solely on the PSI. We instead remand for the trial court to determine defendant's DWLR conviction classification and to allow the parties to supplement the record for purposes of that determination.

30

¶ 104                                    III. CONCLUSION

¶ 105        For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed

as to defendant's conviction for driving while license revoked. However, because the conviction's

Class 2 felony classification has not been established, defendant's eight-year sentence is vacated,

and the cause is remanded for the trial court to determine defendant's eligibility for a Class 2 felony

sentence.

¶ 106        Affirmed in part and vacated in part; cause remanded.

¶ 107        JUSTICE PETERSON, concurring in part and dissenting in part:

¶ 108        I cannot join the majority in affirming defendant's conviction because I believe the court's

error in reversing its decision that the necessity defense was available as a defense to DWLR after

defendant had already testified is structural error and requires automatic reversal. Illinois courts

have equated second-prong plain error with structural error, and "[a]n error is typically designated

as structural only if it necessarily renders a criminal trial fundamentally unfair or is an unreliable

means of determining guilt or innocence." *People v. Moon*, 2022 IL 125959, ¶ 28. Such errors

have also been said to "erode the integrity of the judicial process and undermine the fairness of the

defendant's trial." *People v. Herron*, 215 Ill. 2d 167, 186 (2005). In determining whether an error

is structural, we are not limited to those errors identified by the United States Supreme Court as

structural. *Moon*, 2022 IL 125959, ¶¶ 29-30 (structural errors include "a complete denial of

counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial,

racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction").

If "structural error is found, automatic reversal is required." *Id.* ¶ 74 (citing *Herron*, 215 Ill. 2d at

186-87).

31

¶ 109 "A defendant's right to testify at trial is a fundamental constitutional right, as is his or her right to choose not to testify." *People v. Madej*, 177 Ill. 2d 116, 145-46 (1997).

" '[The Fifth Amendment's privilege against self-incrimination] is fulfilled only when an accused is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." ... The choice of whether to testify in one's own defense … is an exercise of the constitutional privilege.' " *Rock v. Arkansas*, 483 U.S. 44, 53 (1987) (quoting *Harris v. New York*, 401 U.S. 222, 230 (1971) (Brennan, J., dissenting, joined by Douglas and Marshall, JJ.), quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)).

Here, defendant chose to testify and admit that he was driving the vehicle because the court ruled that necessity was a defense available under the law when denying the State's pretrial motion. However, after defendant testified and admitted to the elements of the offense, which is required for the necessity defense, the court reversed its pretrial ruling and held that necessity was not available as a defense. The court based its reversal upon *dicta* in our supreme court's opinion in *People v. Jackson*, 2013 IL 113986, that driving while license revoked is a strict liability offense and that the defense of necessity is not available. Although the *dicta* in *Jackson* was unnecessary for the decision, and one might argue there is contradictory authority from our supreme court (see *People v. Kite*, 153 Ill. 2d 40, 44 (1992) (indicating that necessity can be raised as an affirmative defense to a strict liability offense)), assuming *arguendo*, that it is precedential, this case must nonetheless be reversed.

¶ 110 Had the court not given defendant the ultimately false ruling and impression that necessity was available to him, he would have known the only result that could come from his testimony that he was driving would be a conviction. At the time he chose to testify, he was under the impression that admitting to driving and explaining the circumstances that led him to drive could

32

result in the jury acquitting him based upon the defense of necessity. Essentially, the court created an untenable situation wherein defendant believed it to be beneficial to give up his constitutional right against self-incrimination in order to present the defense of necessity, and then eliminated the only potential benefit by ruling that necessity was unavailable pursuant to *Jackson*. Under these circumstances, I cannot say that defendant gave up his fundamental right not to testify in the unfettered exercise of his own free will. Instead, he was induced by the court's pretrial ruling that the necessity defense was available. I would also conclude that reversal is required. This is because, under the bizarre circumstances presented, defendant not only gave up his right to remain silent but provided the only direct evidence of an element of the State's case—that he was driving. The waiver of a fundamental constitutional right, resulting in an admission to an element of the State's case due to the trial court's two mutually exclusive rulings, leads to the conclusion that the trial process was defective in this case and the fairness of defendant's trial was clearly undermined. It was fundamentally unfair for the court to induce defendant into testifying by its ruling and then make an untimely revocation of that ruling after the State gained the benefit of defendant's testimony. See *People v. Cooper*, 66 Ill. App. 3d 205, 207-08 (1978) (reversing defendant's conviction where the circuit court initially ruled that his prior conviction could not be used for impeachment purposes but reversed that decision after defendant testified and stating "[t]he untimely revocation of the prior ruling was fundamentally unfair to the defendant and placed him in an untenable and prejudicial situation").

¶ 111 I further note that it is immaterial that the court advised defendant that it would wait to make a determination as to whether to give the necessity instruction until after the evidence was presented. This, again, gave defendant the impression that if he put forth sufficient evidence regarding necessity, that he would be entitled to the instruction. At that point, although the court

33

did not guarantee he would get the necessity instruction, defendant obviously believed it was worth the risk to forgo his right to remain silent and instead testify in regard to the facts he believed established a necessity defense. However, had the court granted the State's motion before trial and ruled that the necessity defense was unavailable as a matter of law pursuant to *Jackson*, he would have known there was no potential benefit in testifying that he was driving. The defendant clearly would have exercised his constitutional right to remain silent. Defendant could then have held the State to its burden of proving beyond a reasonable doubt that he was driving without any direct evidence that he was driving. In this case, the officer was operating under an assumption that defendant was the driver, as evidenced by his testimony that he did not see defendant driving, and he did not recall defendant ever stating he was driving.

¶ 112    At the beginning of his trial, defendant had two options to choose from to defend his case, which invoked constitutional rights. He could exercise his right to remain silent and challenge the State's evidence and its ability to prove the charge beyond a reasonable doubt. Alternatively, he could choose to testify and explain the facts and circumstances he and his attorney believed would support the jury receiving the necessity instruction and possible acquittal based on that defense. The procedure followed by the court eliminated both options in their entirety in one fell swoop after the defendant chose the necessity defense and decided to waive his right to remain silent. This process guaranteed his conviction and cannot stand.

¶ 113    The majority concludes that the defendant's conviction would have been a foregone conclusion if he had opted to remain silent and challenge the State's ability to satisfy its burden of proof. On this record I disagree. Further, we will never know what evidence or examination the defense may have offered to cast doubt on the State's assertion that defendant was the driver had he known the court's ultimate ruling on the necessity defense before trial. I would hold that the

34

error of ruling on a pivotal pretrial legal issue such as the availability of an affirmative defense after the evidence has been presented, and in such a way as to guarantee defendant's conviction, should be added to the list of examples of structural error in Illinois jurisprudence.

¶ 114    As I agree with the majority decision regarding the sentencing issue, I partially concur in the decision. However, I respectfully dissent from the affirmance of defendant's conviction.

*People v. Brown*, 2023 IL App (3d) 210460

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 18-CF-787; the Hon. Alicia Washington, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Karalis, and Dimitri Golfis, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino, Thomas D. Arado, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |